## NATIONAL BANK OF COMMERCE v. TOWN OF GRENADA.

### (Circuit Court, D. Colorado. January 16, 1890.)

1. MUNICIPAL CORPORATIONS—BONDS—RECORD OF ORDINANCE.
    Under Gen. St. Colo. § 25, statute on town ordinances, providing that "all ordinances shall, as soon as may be after their passage, be recorded in a book kept for that purpose, and be authenticated by the signature of the presiding officer * * * and the clerk," it is no defense to an action on municipal bonds that the ordinance in pursuance of which they recite that they were issued was not so recorded and authenticated, as such acts are not required to give effect to the ordinance.

2. SAME—PUBLICATION OF ORDINANCE.
    It is not necessary, to the validity of such ordinance, that it should be published in accordance with the provision of said section 25, that "all by-laws of a general or permanent nature, and those imposing any fine, * * * shall be published in some newspaper, * * * and it shall be deemed a sufficient defense to any suit or prosecution for such fine * * * to show that no such publication was made, * * * and such by-laws and ordinances shall not take effect * * * until the expiration of five days after they have been published," as that provision relates to penal enactments.

3. SAME—BONA FIDE HOLDER—RECITALS IN BONDS.
    Where bonds recite that they were issued for the purpose of funding the existing debt of the city, and the city is authorized to issue such bonds, it is estopped, as against a bona fide holder, to set up that the antecedent indebtedness was fraudulent.

4. SAME—FUNDING DEBT—NOTICE TO WARRANT HOLDERS.
    Under Gen. St. Colo. § 3419 et seq., authorizing the issue of bonds to fund the floating debt of municipalities, and requiring publication of notice to warrant holders, failure to publish the prescribed notice does not render the bonds invalid, where the outstanding warrants were presented and accepted for the bonds.

5. SAME—PETITION—REQUISITES.
    Objection that the petition to fund the debt was not presented by 50 tax-payers, as required by said act, is untenable against a bona fide holder, where the records state that the required number of qualified citizens had petitioned, and the ordinance ordering the election recites the presentation of the petition by qualified electors.

6. SAME—CURING DEFECTS.
    Where the ordinance for the election shows that the question to be submitted was whether the floating indebtedness should be funded, and the record of the canvassing board states that a majority of the electors voted in favor of funding the debt, and there is nothing of record to show that the notice of election was defective, the bonds are not invalid, though the notice published was for election on the proposition to issue water-works bonds.

7. SAME—WATER-WORKS BONDS—LENDING CREDIT.
    As Const. Colo. art. 11, § 8, authorizes municipal corporations to create debts for water-works, and imposes no limit, bonds issued for this purpose in advance of the construction of the works are not invalid by reason of article 11, § 1, forbidding such corporations from lending their credit.

At Law. Action of debt.

*S. L. Carpenter*, for plaintiff.

*Alvin Marsh*, for defendant.

PHILIPS, J. This is an action of debt to recover on interest coupons attached to funding bonds issued by the defendant in 1887. The bonds are payable at the National Park Bank, New York, fifteen years after date, or after five years, at the pleasure of the city; interest, 8 per cent. The bonds and coupons were duly signed by the mayor and clerk, and duly registered and recorded with the state auditor and the town treasurer.

A jury being waived, the cause was submitted for hearing before the court on the following agreed statement of facts, in their abbreviated substance, to-wit:

The town of Grenada was incorporated as a municipal corporation in the month of July, 1887. On the 1st day of October, 1887, a petition of 50 citizens and electors of the town was presented to the board of trustees, praying for the appropriation of a sum, not to exceed $36,000, for procuring water for domestic purposes. At a meeting of the board on the 8th day of October, 1887, on motion it was ordered that an appropriation of the sum of $36,000 be made for the purpose of supplying the town with water for domestic purposes. On the 6th day of October, 1887, an ordinance was passed by the board numbered 10, concerning water-works, which provided, in substance, that, for the purpose of supplying the city with water suitable for irrigation, domestic, and other purposes, a reservoir of not less than 1,000 barrels' capacity shall be built, and water supplied therefrom from the Arkansas river, and that scrip be issued to pay therefor, not to exceed $36,000, passed November 12, 1887, signed by the mayor, and attested by the recorder, and duly published in the Grenada Exponent. At said meeting of October 6th, one Thomas Doak submitted a proposition to construct water-works for the town for the sum of $36,000, upon condition that the board would first issue warrants of the town, and deliver the same to him, to said amount, to enable him to raise funds, upon the sale of the same, for the purpose of constructing said works. The proposition was accepted by the town, and warrants to the amount of $36,000 were issued and delivered to Doak. On the 10th day of October, 1887, a petition of 50 qualified electors, alleging that they had paid taxes the preceding year, was presented to the board, requesting that a notice be published for 30 days to holders of warrants to present and exchange the same for bonds of said town, under the provisions of the act of the legislature entitled "An act to enable the several towns and cities of the state to fund their floating indebtedness." In the recorded proceedings of the board the proper notice appears to have been given, duly certified by Ed. Walsh, the city clerk. It is admitted that this record entry is false, as no such notice was in fact published.

On the 4th day of November, A. D. 1887, said Doak entered into a written agreement with said board of trustees for the construction of said water-works, in substance as follows: The said Doak agreed to build a reservoir with the capacity of 1,000 barrels of water, from which water might be used for domestic purposes; said reservoir to be supplied with water through a ditch to extend from the Arkansas river at some suitable point westerly of said city to said reservoir. "That said city of Grenada shall pay and deliver to said Doak, his heirs or assigns, its legally issued scrip, to the full amount of $36,000. * * * Said city shall also secure and grant to said Doak, his heirs or assigns, the

right of way through said city limits free of all expense to said Doak, so that in digging or constructing said ditch through said city said Doak," etc., "shall be at no expense, either for right of way, damages, bridges, or any other expense, except excavation. Said city hereby agrees to pay all expense, damages, or other demands made on said Doak," etc., "in the digging or construction of said ditch through said city, except engineering and excavating. Said city shall also furnish with good and sufficient title to said Doak, his heirs or assigns, suitable lands, on or adjacent to the ditch, for the uses and purpose of a reservoir. Said Doak," etc., "shall locate said ditch in and through said city wherever he may choose, except said ditch shall be on or along some street, streets, alley, or alleys. Said city shall at once proceed to refund said issued scrip into refunding bonds, bearing interest at eight per cent., payable semi-annually, and deliver same to said Doak, his heirs or assigns. Said Doak, his heirs or assigns. to begin work as required by law, and complete the same as soon as it is practicable so to do."

On the 7th day of November, 1887, a petition containing the same names as the former petition was presented to the board, petitioning it to submit to a vote a proposition to fund $36,000 of the city indebtedness with 8 per cent. funding bonds. On the 10th day of November, 1887, Doak presented, at a meeting of the board, the $36,000 of warrants, and offering to accept in lieu thereof the funding bonds of the town, which was accepted. On the 11th of November, 1887, the board adopted the following ordinance: Section 1 directs the submission to the qualified electors of the town to vote on the question whether the board of said town shall issue bonds thereof under the provisions of an act of the legislature of the state of Colorado entitled "An act to enable the several cities and towns of the state to fund their floating indebtedness," in exchange at par for warrants of said town issued prior to date of the first publication of the notice heretofore published in this behalf, in accordance with the petition heretofore presented to said board, etc.; such question to be submitted at the special election, at the usual place of holding elections, on the 12th day of December, 1887. Section 3 provided that if, upon the return of the canvass of the vote of said election, according to law, it should be found that a majority of the electors who shall have paid taxes upon property assessed to them in said town the preceding year shall have voted in favor of said proposition, and the result of said election be so declared, then the mayor and clerk of said town were authorized and directed to exchange bonds of said town to the amount of $36,000, and no more, at par, for and on account of certain warrants to the amount heretofore issued to one Thomas Doak, in payment for the construction and operation of water-works within said town, as per the ordinance heretofore passed in that behalf. Section 4 directed that notice of said election be published according to law. This ordinance was not recorded in the ordinance book, nor signed by the mayor and clerk, nor published in any paper.

It is admitted that no poll-tax was ever paid by the citizens of said town after its incorporation, and that the total value of the real and personal property, as shown by the legal assessment in said town, was $119,000. Notice was duly given of the special election ordered in said ordinance, which recited that the election was "for the purpose of voting upon the proposition to issue $36,000 in bonds for water-works for the town of Grenada. Those voting for said bonds shall have written or printed upon their ballot, 'For water-works bonds. Yes.' Those voting against the bonds will have written or printed upon their ballots, 'For water-works bonds. No.'" At a meeting of the board of trustees held December 17, 1887, as a canvassing board, it was found that a majority of the electors of said town voted in favor of funding the town debt; whole number of votes cast, 24; all in favor thereof, none against. At this same meeting it was ordered that the mayor and clerk of the town be au-

thorized to issue bonds in the sum of $36,000, which bonds were thereafter issued and delivered to said Doak in exchange for his said warrants. No annual appropriation ordinance was passed by the town board in 1887, and no ordinance was ever passed providing for a tax to pay principal or interest upon said bonds or coupons. The water-works in question were never constructed, nor any part thereof.

It is admitted that of said bonds, with coupons attached, numbered 9 to 72, inclusive, were sold or negotiated to plaintiff, who purchased them before maturity, in good faith, and without notice of the proceedings of the said town board; that they were so bought in open market, for a valuable consideration; and that the plaintiff is a banking corporation, resident of Kansas City, Mo.

The agreed statement contains other specifications, not deemed important to recite.

If the parties joining issue herein were Doak, the contractor, on one side, and the defendant town on the other, I should not hesitate to hold that the consideration of the bonds had failed, and no recovery could be had. That Doak and the town officials, or some of them, entered into a conspiracy to plunder the tax-payers of this town, does not admit of debate. It was as bold in conception as it was graceless and impudent in execution. That an honest constituency, with the instinct of self-preservation, could sit quietly by and permit such a larcenous scheme to culminate before their eyes is almost incredible. It is transparent, from the face of the whole proceedings, and especially on the face of the contract made by Doak with the town, that he never intended to construct the water-works. No place near or approximate to the town is fixed for planting the reservoir, while the title to the land for the reservoir, and the right of way for the ditch, were to vest in Doak. The city obligated itself to issue to him at once, before any work was done, warrants for $36,000, and to proceed at once to refund the warrants in funding bonds, and deliver them to Doak, without any security being asked from or given by him for the performance of the work. The only promise made by him was to begin the work as required by law, and complete the same as soon as practicable. It has not yet appeared when the law requires such work to begin, and it has not yet proven to be practicable for him to begin or complete it, and presumably it never will be.

But the question to be decided here is between the plaintiff, a purchaser of these bonds for valuable consideration, before maturity, and in good faith, and the defendant corporation, whose officers and agents permitted the bonds to be placed upon the market as commercial paper. The bonds as offered for sale were in due form, and properly executed. They had been registered with the state auditor, and recorded by the town treasurer, as certified on their face. It was recited in the bonds that they had been issued under the sanction of an ordinance providing therefor, for funding and paying the existing debts of the city of Grenada.

It is to be conceded that the plaintiff was put upon inquiry before making the purchase to ascertain whether or not the law of Colorado conferred upon the town of Grenada power thus to issue such bonds, and possibly whether or not such ordinance was in fact passed. By section 3419 et seq., Gen. St. Colo., power was conferred upon the board of trus-

tees of incorporated towns to issue bonds of this character, to fund the floating indebtedness of the town.

The bond recites that the mode adopted by the town for the authorization of the issue of the bonds was "under ordinance of the city council of the city of Grenada adopted," etc. It is urged by counsel for defendant that no such ordinance was legally adopted. Its infirmity is predicated on two facts: *First*, that the ordinance, after being voted on and receiving the requisite number of votes, was not duly recorded in a book kept therefor, nor was it authenticated by the signature of the mayor and the attestation of the clerk; and, *second*, that it would not become operative as an ordinance until it was duly published in a newspaper, which was not done.

In respect to the authentication of the ordinance by the signature of the mayor, etc., unless some positive statute applicable to such case requires such signature as essential to the validity of the ordinance, this objection cannot be sustained. The doctrine of the old English courts as to corporations in that country, holding that the mayor was an integral part of the corporation, whose presence and co-operation were necessary to a valid corporate meeting and acts, does not obtain in this country. In this country the powers and duties of mayors depend largely, if not entirely, upon the provisions of the organic act or charter of the municipal body, or the by-laws authorized thereby. Primarily his powers and duties are executive and ministerial, and not judicial or legislative. So the general rule is that the essentiality of his signature to the validity of an ordinance depends upon the charter or the organic act of the corporation, and, unless so made essential, it is merely directory. 1 Dill. Mun. Corp. (3d Ed.) §§ 208, 260, 271. The statute of Colorado concerning town ordinances (section 25) provides that "all ordinances shall, as soon as may be after their passage, be recorded in a book kept for that purpose, and be authenticated by the signature of the presiding officer of the council or board of trustees and the clerk." It will be observed that this statute does not require the signature of the mayor, or the attestation of the clerk, to give effect to the ordinance. But the act only requires that the ordinance, as soon as may be after its passage, shall be recorded in a book, etc., and be authenticated by the signature of the presiding officer, etc.; thus clearly implying that the signature is not essential to the passing of the ordinance, but is merely for the purpose of evidencing its authentication, because apparently the signing is after the recording, and the recording is only to occur as soon as may be after the passage. So far as this plaintiff, a stranger, taking the bonds issued under such ordinance, is concerned, it becomes a binding act upon the city, provable by any other competent evidence. *Bank* v. *Dandridge*, 12 Wheat. 74. This view is strongly maintained, both on reason and authority, in *Martindale* v. *Palmer*, 52 Ind. 411, and *loc. cit.*

As to the publication of the ordinance, there can be no question that where, by express statute, such ordinances do not become operative until published in a prescribed manner, they have no force and effect until so published. The further provision of said section 25 is as follows:

"And all by-laws of a general or permanent nature, and those imposing any fine, penalty, or forfeiture, shall be published in some newspaper published within the limits of the corporation, or, if there be none such, then in some newspaper of general circulation in the municipal corporation; and it shall be deemed a sufficient defense to any suit or prosecution, for such fine, penalty, or forfeiture, to show that no such publication was made: provided, however, that if there is no newspaper published within, or which has a general circulation within, the limits of the corporation, then and in that case, upon a resolution being passed by such council or board of trustees to that effect, such by-laws and ordinances may be published by posting copies thereof in three public places, to be designated by the board of trustees, within the limits of the corporation; and such by-laws and ordinances shall not take effect and be in force until the expiration of five days after they have been so published or posted. But the book of ordinances herein provided for shall be taken and considered in all courts in this state as *prima facie* evidence that such ordinances have been published as provided by law."

It is apparent from this provision that the right to defend on the ground of the omission to publish is limited to by-laws of a penal character, and to suits or prosecutions for fines, penalties, and forfeitures arising out of a violation of such by-laws; and on the maxim, *expressio unius, exclusio alterius,* the idea of any other character of ordinance being in the mind of the law-maker is not tenable. It is also manifest, from the subject-matter and context, that the provision that "by-laws and ordinances shall not take effect," etc., "until the expiration of five days after they have been so published or posted," being qualified by the word "such," evidently has reference back to the penal enactments of the governing board; for it is not to be conceived that the law-maker would make a provision of a substantive character, limiting the operation of all ordinances from the period of their publication, by covertly and obscurely mingling the provision with one providing for an alternative mode of publication by posting copies in certain public places. Neither am I of the opinion that this section applies to an ordinance like the one in question, which is special in its character, not for the government and guidance of the people, but designed only to authorize a change in the form of the municipal indebtedness. *Amey* v. *Mayor, etc.,* 24 How. 365; *Blanchard* v. *Bissell,* 11 Ohio St. 103. Furthermore, if there were mere irregularities and defects in the passage of the ordinance, is the defendant in a position to successfully make such objection, after its agents have recited in the bonds that the ordinance was adopted, and the bond has been bought in the market? *Van Hostrup* v. *Madison City,* 1 Wall. 291.

It is insisted, with vigorous repetition, that in fact the debt funded was no existing indebtedness of the town; that it had its origin in fraud; that the town never received any consideration for the bonds, and none in fact was contemplated by the conspirators to the fraud. All this I firmly believe, from the evidence before me. But the insurmountable obstacle in the way of this defense is that by the recital on the face of the bond, that it was issued under ordinance "for the purpose of funding and paying the existing debt of the city of Grenada," the defendant is precluded, as against this plaintiff, from now asserting the non-existence of the antecedent debt. *Hackett* v. *Ottawa,* 99 U. S. 86. In *Ottawa* v.

*Bank,* 105 U. S. 343, Mr. Justice HARLAN, reaffirming the holding in *Hackett* v. *Ottawa, supra,* said :

"The city council had power, the voters consenting, to issue negotiable securities for certain municipal purposes. If the purchaser, under some circumstances, would have been bound to take notice of the provisions of the ordinances whose titles were recited in the bonds, he was relieved from any responsibility or duty in that regard by reason of the representation, upon the face of the bonds, that the ordinances provided for a loan for municipal purposes. Such a representation, by the constituted authorities of the city, would naturally avert suspicion of bad faith upon their part, and induce purchasers to omit an examination of the ordinances themselves; and, consequently, the city was estopped, as against a *bona fide* holder for value, to say that the bonds were not issued for legitimate or proper municipal or corporate purposes."

The other objection to the issue of these funding bonds may be summarized as follows: That the statute prescribes, as preliminary to the act of funding, that notice to holders of warrants must be published in a given manner, which was not observed in this instance; that the statute prescribes that 50 tax-payers must first petition the town board of trustees to fund the debt, which was not observed, as the petitioners had not in fact paid any tax to the town to qualify themselves; and, finally, the law requires that the adoption of the ordinance in question should be preceded by a vote of a majority of tax-paying voters, whereas the vote submitted in this case was for or against issuing "water-works bonds," instead of for or against "funding town debt," as prescribed by statute.

The fact that notice to the warrant holders was not published is not, in my opinion, of substance. The principal object of this obviously is to secure the presentation of the warrants for the purpose of funding such debt. The end of the law, in this respect, was substantially obtained by the act of presentation of the outstanding warrants, and the offer of the holder to accept therefor funding bonds.

As to the objection that the requisite petition was not presented by qualified tax-payers for the election, it is answered that, as a matter of fact, the records of the corporation show when the plaintiff bought the bonds that the required number of qualified citizens had petitioned for the election; and thereupon the board of trustees passed a formal ordinance, reciting the fact of the presentation of the petition by the qualified electors, and ordering the election. So that, had the plaintiff gone to the town records before purchasing, it would have been advised that the necessary preliminary steps to a legal election had been taken; and, if the petitioners and electors were not tax-payers of the town, that was a fact resting *in pais,* to be ascertained *quasi* judicially by the municipal board; and the law presumes, in favor of the *bona fide* purchaser, that such conclusion of the town board was absolutely correct. *Commissioners* v. *Aspinwall,* 21 How. 539; *Bissell* v. *Jeffersonville,* 24 How. 288; *Town of Coloma* v. *Eaves,* 92 U. S. 484. Superadded to which, I do not think that the provisions of the statute of Colorado, respecting the qualification of such petitioners and electors having paid taxes to the town,

can have any application to the case of a town organized after the taxing period for the current year had passed. In fact, other provisions of the statute clearly make an exception in favor of such newly-created municipalities.

As to the remaining objection, that the form of the vote submitted by the ordinance to the electors was not statutory, it must be conceded that such form of submission was calculated to deceive, as a tax-payer might be willing to vote bonds to secure water facilities, yet be adverse to issuing bonds to fund the general floating indebtedness of the town. And although the debt in question was incurred in an ·effort to provide the town with water, yet if the form of submission be important, and a vote in favor of funding was essential to the exercise of the power by the town board to issue funding bonds, this defect would be embarrassing to the right of recovery herein, unless the infirmity be cured by·some recitation in the bond or other affirmation of record. We find from the agreed statement of facts the following admissions: That on November 11, 1887, an ordinance was adopted providing for this election. The ordinance, contrary to the assumptions in the objections, showed on its face that the proposition to be submitted to the electors was whether or not they would vote for funding the ·floating indebtedness of the town, (election to be held December 12, 1887.) The notice of election, however, as published, stated that the proposition to be voted on was: "For water-works bonds. Yes;" "For water-works bonds. No." The record then shows that at the meeting of the town board held December 12, 1887, as a canvassing board, they found and declared "that a majority of the electors of said town voted in favor of funding the town debt;" and it was at this meeting that the bonds in question were ordered to be issued. What is the effect of such a record made by the municipal legislative body upon a purchaser of these bonds? Had the plaintiff examined the record before purchasing, it would have found the requisite formal ordinance directing the election. It would have found, further, that the canvassing board had declared that an actual majority of the voters of the town had, conformably to the ordinance, voted for funding the debt of the town. There was absolutely nothing of record to indicate that the notice was defective. The forged entry of record, made by the clerk of the board, showed that the proper notice was given, and the fact of an improper notice rested alone *in pais;* which, under all the facts appearing affirmatively of record and on the face of the bonds, the purchaser is not bound to look up, and therefore cannot be bound thereby. "In a suit against a municipal corporation by a *bona fide* holder of its bonds, whose title accrued before maturity, the corporation cannot show by way of defense, if the legal authority of the corporation to issue the bonds is sufficient and comprehensive, a want of compliance on its part with formalities required by the statute authorizing the issue of the bonds, or show frauds in the their own agents in issuing them." *Grand Chute* v. *Winegar*, 15 Wall. 356. The case at bar in this respect is unlike that of *McClure* v. *Oxford*, 94 U. S. 429. There the bond referred to the act of the legislature authorizing its issue, and a purchaser, of

course, was affected with notice of the requirements of the law. As the act under which the bonds purported to have been issued took effect only from its publication, it was manifest, from the date of the bond itself, that the required publication of the act could not have been made prior to the issue of the bonds, and it could not, therefore, have been authorized by the law as claimed on its face.

It is finally insisted by the learned counsel for defendant that section 1, art. 11, of the state constitution, prohibits, in strong terms, such municipal corporations from lending their credit in any form in aid of any individual, association, or corporation whatsoever. But by section 8 of said article special exception is made in favor of the power by such corporations to create debts for supplying themselves with water for irrigation, for suppressing fires, and for domestic use. There seems to be no limit to the extent of the debts which may be incurred for such purposes.

The facts in this case aptly illustrate the great danger to the tax-paying constituency in intrusting such large power to the average trustees of local communities, and the bitter experience of its oppressiveness may teach the people of Colorado the same lesson learned by some of the older states, that the only complete safeguard of the people against such exposure lies in the unconditional abrogation and denial of the power itself. Here is a community of only about 400 souls, with an assessed valuation of property of only $119,000, with a bonded indebtedness, in the first four months of its corporate existence, of $36,000, without one dollar of benefit in return having been received by the inhabitants. How such a burden is to be met, and how the court is to enforce its payment, is not apparent to my mind. But the question before me is one of law only, and to that only do I now respond. My conclusion is that the plaintiff is entitled to judgment for the principal and interest of the coupons sued on herein, and it is accordingly so ordered.